The first case of the morning is in re. the Marriage of Metzger and McDermott, 4090552. For the appellate, Mr. Martinkus. For the athlete, Mr. Randall. You may proceed. Good morning, Mr. Court. Good morning, Your Honors. I represent Lisa Metzger in connection with the divorce case that occurred in Sangamon County. I was not the trial attorney of record. I've been doing this for 33 years, and you often get people come into your office and complain about I didn't get treated fairly in a divorce case, or my attorney didn't do this, and so forth. I always take those sorts of claims with a great deal of skepticism and a great deal of salt, because generally I think trial courts do a very good job. I've got to be honest with you, after reviewing this transcript, I've never raised 10 issues, and I've been to many appellate courts before this court, many, many times, the Supreme Court, never. But I found this case to be one in which there were just substantial errors made that significantly affected the rights of my client. You start off, I think, looking at the order of the court itself. If you just look at the order of the court and look at the numbers, a lot of this is simple math. At page 13 of my brief, I set forth a chart, just trying to break down for you. If you look at what Judge Mitchell did, even assuming all of the errors which I think he made, forget about that, just look at what he did. You look and you see that he gives $535,261 as the net distribution to Kevin. That's looking at, he awards $693,811, but in fairness, he's going to pay a $100,000 utilization payment. He's picking up $30,296 of debt. And then there's a $28,254 non-marital interest that the court awards him. So if you break all that down, if you look at everything on its face, 56% to Kevin, and at least he gets 44%. That's a $112,776 differential. And this is a case where I think, clearly, if you look at the criteria set forth in the statute, there would be no basis for a disproportionate award. Just proportions or just division of property in this case would be 50-50. So I think you start off with that proposition. If you then look at what I believe the actual distribution is once you take out the errors, which I believe the court made in terms of classifying marital and non-marital property, that's at page 29 of my brief, and I've charted it for you again so you can try to follow the math on this. But if you take those same numbers and you then add to Kevin's column an A.G. Edwards account of $18,946, why would you do that? Because there's no evidence. I scoured this record. There's no evidence to support that that account was opened up prior to the marriage. There's one exhibit that shows it was opened up a year after the marriage. So I don't know how the court, frankly, arrived at a decision to treat it as non-marital. I don't think there's any evidence to support it. If you also take the property that Lisa had, Grand Street with the marital residence and 8th Street, which is the rental, clearly, if you look at the statute, any increase in value is going to be considered non-marital. It stays in that state subject to any claims of reimbursement to another state. If you do that, you look and determine that she receives $422.45 less $171,982, less $48,533. Those are the amounts for her non-marital interests. You arrive at the total amount of marital property allocated to her of $201,970. Now that's a remarkable discrepancy. Kevin gets 74.3 percent. Lisa gets 25.7 percent. But most importantly, that's a differential of $380,491. And there's just no basis in this record to support such discrepancy. If anything, one could argue that Lisa, who doesn't make anywhere near the kind of money that Kevin makes, who has some physical or health problems, would be entitled to a greater percentage. We're not even looking at that. We're saying look at 50-50. Then I think the other thing you have to look at is if you look at the order of the court-upon-reconsideration, and I think that's quite telling. Because Judge Mitchell, first of all, talks about in his memorandum of decision, this is 816 of the appendix, he talks about the defendant, Kevin McDermott, has taken the position that the court incorrectly classified a portion of the residence. Well, that's not true. That's just a mistake. It's Lisa Metzger, our position, that that was happening. So what he does then is say that assuming that it was a misnomer, just a misnomer, so yeah, okay, it was $143,000, which I should have considered differently, but it doesn't matter because we could then treat it as reimbursement to the marital estate. The difference is, Your Honor, that if it's her non-marital property, she's entitled to 100% of it. If it's reimbursement, it comes in and she would get 50% of it. It's a glaring math error. So if you just look at the pure math alone, and that's what I did on this, and if you look at that, you're going to come up with the differential of Kevin getting $554,207 and my client getting $345,698, and that is with the amount of reimbursement. My client gets all that reimbursement because she retains the two properties. You come up with Kevin receiving $554,207 versus my client receiving $345,698. That's a differential of $208,509, 62% to 38%. There's just no basis in this record of anything to in fact make such a conclusion. It's just patently unfair. It's patently inconsistent with the statute. You then have to, I think, look specifically at how Judge Mitchell arrived at some of these classifications. First of all, with respect to the Grand Avenue property, marital property, that's where they live, he finds that Mr. McDermott is entitled to a $28,000 and some change reimbursement for a payment he made toward the marital estate for this house, and there's zero evidence on it. Mr. Hearst was Mr. McDermott's expert, and he said, well, I looked at some notes and so forth that Mr. McDermott provided me, and apparently in some of these notes it suggested that he sold his house and there was a $28,000 amount that he got. The statute says you have to prove and trace by clear and convincing evidence any claim contribution that one makes. I was shocked to realize that there is nothing in this record to support this claim. $28,000, if you read the record, is given to Kevin without any evidence to support that contribution. You also then have to look at a couple other issues with respect to these properties. One, there was a purported payment made during the marriage to pay down the mortgage, but at trial, Mr. Hearst, the only expert on this who testified, was asked, well, can you separate the payment in terms of principal and interest? Because as the court is well aware, the interest payment is not going to be considered a credit or reimbursement, only the principal reduction. He says, no, I can't do it. I have no testimony concerning that. So first we have that significant problem. The parties made a kitchen. They remodeled the home, and the evidence was that there was about $100,000 paid. But once again, Your Honor, in my view, and I think consistent with some of your opinions, it shouldn't be a dollar-for-dollar situation, because people put money into homes all the time without any corresponding increase in value. I think a value-added approach, where there's been testimony showing, yeah, we put on a kitchen, and in my opinion, the kitchen resulted in the appreciation of the property by $50,000, something along those lines. But if you look here, the trial court takes all of this and somehow assigns it dollar-for-dollar without regard to any increase in value as some sort of reimbursement or claim against the non-bearable property of my client. Well, there's no evidence to support that. First of all, under Snow, which is out of this district, and under the Supreme Court case of Crook, the position of many courts is that, well, look, if you've had a substantial contribution but you receive the benefit of living in this property, you receive all of the benefit of possession and enjoyment, the marital estate has already been reimbursed. There has been already a quid pro quo for the money that was advanced. And that's clearly what you have here. They lived together in there for about 10 years. Lisa lived there another three years. So whatever amount of money would have been put into her non-bearable residence, the marital estate received an enormous corresponding benefit. They didn't have to spend money on rent. They didn't have to go out and buy another home. The use of that property clearly offset any improvements that were in fact made. The other thing that I found quite remarkable was there was an appraisal that showed at the time of marriage the property was valued at $140,000. And instead of using that appraisal, the trunk was elected to use the testimony of Mr. Hurst, not a real estate appraiser, and his testimony was that it was worth, I don't remember, $59,000 or whatever thousand dollars, a far lesser amount. How did you come up with that number? Well, I went back and I looked at the Sangamon County Tax Assessor's Office, and that's the amount that they put down that they used as the allocated amount of fair market value. I mean, it's remarkable to me that that sort of testimony would be used as the basis to determine value. It's incompetent. I know there was no objection made. I realize that, and I raised that in my brief that I don't think much of Mr. Hurst's testimony would have ever met the standards of Wilson v. Clark. It shouldn't have been admitted. But there was no objection, so I can't complain about that. Can't do it. But still, notwithstanding the lack of objection, the trial court has the duty to look at the evidence, determine the weight that evidence should be given. In this case, the weight should be almost nil. You have Mr. Langvane has a real estate license, he's an appraiser, he gives the opinion to the court, the court rejects it completely. If you look at this case, in every possible situation where the court could have given some benefit to my client, the court did not. Every single inference, every single position went the way of Mr. McDermott. And there's no basis for it. That's the thing that's really difficult. So you have those three concerns that I have. One, this A.G. Edwards account, clearly marital. You have the Grand Avenue house, which should be clearly non-marital property, not marital property. And I don't think there should be any claim for reimbursement for the reasons I've told you. The 8th Street property is a rental piece of property. The testimony trial, Lisa said, no, this is from the rents. Any payments that were made were from the rents. There's no evidence in support of the proposition that the marital estate is entitled to any reimbursement whatsoever. You can scour this record and unless I miss something, which I don't believe I have, there's no support for that. So those are my concerns with respect to the initial distribution of property. If you then look at some of the other issues here that we talked about, we have a dissipation claim. There was tons of testimony. I've got all the exhibits attached to the brief. The brief sets out in great detail, linearly, how much in fact was spent. This was spent on a woman, Kath Noe Conner, whom I believe Mr. McDermott was having an affair about. I don't care about the affair. Counsel I know raises in the brief, well, we're trying to put fault in. I'm not trying to put fault in. We don't care about that. I want my money from my client because she's entitled to it. We have $27,000, $21,851.24, which is literally unaccounted for. Testimony trials, well, I think this was a loan, or I don't remember if it was repaid, or it might have been a fee I paid her to witness the will, and on and on and on. If you look under Holt House, which this court I'm most familiar with, we don't have to use the date of separation to determine when dissipation starts. We can look when the marriage has begun an irretrievable breakdown. And the evidence, like in Holt House, and very similar to this case, the evidence in this case shows unequivocally that in 2001 the parties stopped having sex. They stopped talking to each other. I think Kevin, if I remember correctly, we talked about three times a year. They didn't do anything together. Zero that would in any way have the incidence of coverture that one would expect if you're in a good relationship. The marriage had begun an irretrievable breakdown. There's no question about it. So the evidence, again, all of this before the court, and the trial court basically decides not to provide any reimbursement for the dissipated funds. So now we have a remarkably skewed property division. We have the trial court incorrectly characterizing two pieces of property as marital when they're clearly non-marital under the statute. We have an account of $18,000 for which there's no evidence to suggest that it could possibly be determined non-marital, and it was. So everything, again, is going against my client. And then finally, if you really look at this, in addition to the dissipation claim, we have the maintenance claim. This court's case in Selinger, in my opinion, is a real good barometer of what should have taken place in that case. In this case, excuse me. In Selinger, you had disparate financial positions. Husband and maid, I don't remember exactly. $200,000 a year or something along those lines. A wife who was, I think, a nurse made $38,000. And this court said, well, look, you can't just look at the fact that she has some ability to meet her needs, but you also have to look at what the standard of living is and what, realistically, she's going to need to come close to that standard of living. And in Selinger, this was a case where the court said no. It reversed the trial court. This should be a permanent maintenance award. Now, here you have a very similar situation. You have an attorney who makes over $200,000 a year. She has the work since she tried to get pregnant and gave up her teaching position, had made some good money back in the day, $50,000, and worked for a substantial amount of time by agreement. You have a doctor now who comes in, Dr. Boland, who testifies, hey, you know what, she has some significant health problems. She's depressed. She has all sorts of symptoms that are not going to permit her to work. Now, that's the only evidence that was presented on that point. It wasn't like they presented a doctor that said, nah, she's a big fake. Don't give her a penny for maintenance because she could get her butt out there and work. There was no conflicting testimony. This is uncontradicted testimony. So you have a trial court that's sitting here looking at a woman who is unemployed, has health problems, whose evidence deposition of her doctor said she can't work right now. And what the trial court does is say, well, you get two years of maintenance. Well, it's either permanent maintenance subject to some motion to review later or you have a review period built in. The average really cuts her off for two years. The other problem is that while Kevin is making $200,000 plus a year, we've got a lady here who makes nothing. Her affidavit shows she has needs of about $65,000 to $64,000, if I remember. And the trial court gives her $3,000. Now, $3,000 for someone who is making $200,000 plus a year  It doesn't come close to permit her to meet her needs. Here we have a situation where she's getting $3,000 a month for two years. It's not going to come close. Her expenses were $6,400 a month. Even their expert, Mr. Hurst, says, oh, yeah, well, I've looked at these records and I don't think it's $64,000. I think it's like $54,000. I don't remember exactly, but something like $5,400. So how the trial court could conclude under those circumstances that she's only entitled to $3,000 a month, upon which she has to pay taxes and is not even considered in that need that she has shown before, is really difficult for me to understand. Here you have this case where it seems to me the trial court should, in fact, have given her at least $6,000 a month at a minimum. And that's, again, not going to impact tremendously on Mr. McDermott's ability to provide for his needs. There's no minor children in these parties. He has the ability to earn income. He has consistently earned it. So I think when you look at all of these factors, and again, I have all the respect in the world for trial courts. I don't know Judge Mitchell very well. I don't think he does a whole lot of family law. But the point of it is that this is a case where it's just one that yells at you if you look at the record. There's this error here, and it's unfair. You can't give my client such a disproportionate amount of property, marital property. Court confuses it, obviously, when he mixes non-marital estates and marital estates. So you've really got to roll your sleeves up to kind of pull it out and do the math. I hope I did that for you. I tried to lay it out in the brief and the graphs and all the numbers. But if you really take the time to look at the numbers, it's fairly remarkable there's hundreds of thousands of dollars of difference that should probably be awarded to my client, let alone the dissipation, let alone the maintenance claims. So I ask that you look at this. I hope that you read this carefully. I hope you do the math, because if you do, I think there's no question you come out saying, this was just wrong. Any questions, Your Honor? Thank you very much. Thank you. May it please the Court, Counsel? I represent Kevin McDermott. If I could pick up on something Mr. Martinkus said about this was some sort of aberrational case or he'd never seen anything like this. This case, factually, is different than most of the cases wherein many of these issues have been addressed. In that, these parties came together late in life, in their early 40s, they came together established in their chosen careers. Neither one of them contributed to the education or business advancement of the other. Ms. Metzger had a master's degree in teaching. She also was certified as a principal. She was making, I believe, at the time of the marriage, approximately $50,000 a year. Kevin had started a practice on his own as a sole practitioner and was building that each independently. They came together as professionals and they got married but they came together under an agreement which neither disputed. The agreement was essentially Kevin paid all of the expenses. Ms. Metzger, while she continued to work and continued to get salary increases, retained all of her income. This is not a prenup in any sense but she had control of her income. He had control of his income. When it came time to... At some point in time, she didn't quit her job. She took a leave of absence to get pregnant. It was established within a year that that wasn't going to occur medically. This was a paid leave of absence. She continued to draw her salary. I think she made $57,000 a year. She saw that leave of absence. She continued the leave of absence at no pay and I think maybe even continued another year when she finally just unilaterally quit. There was no evidence presented to the court as to what she did or what contribution she made. The issue of being a homemaker, we know there were no children involved, but the issue of being a homemaker was never addressed or raised. Mr. Martinkus made a reference to the judge perhaps not being all that familiar with family law. However, this case family law is still a legal proceeding. It requires evidence. It requires the trial judge to weigh the evidence and make credibility determinations with regard to the evidence. The categories both for maintenance and property division or just that category, they have no meaning in and of themselves without some factual background. I would address that because I think this is an important factor which isn't mentioned. The preliminary factor or the initial factor that's listed in 503 is basically where did the money come from, what the parties contributed, what the parties did to preserve the marital assets and issues then of dissipation and that sort of thing. The evidence that was presented was while Kevin, and again there's no dispute on this. Mrs. Metzger acknowledged he paid everything. He paid the mortgage payments, the kitchen remodeling of $103,000. That money came from him. She offered no evidence it came from her. To suggest there's no evidence that it didn't come from the sale of his house, first off Mr. Hirst testified to that. And by the way, Mr. Hirst testified without objection based on the business records, the records of both of these parties. And he wasn't challenged on it. Mrs. Metzger's records were provided to him. McDermott's records were provided to him and he did an analysis of these things. But there's no question $103,000 was spent on the kitchen. The entire mortgage was satisfied all from Kevin's income. The insurance, the taxes, any repair, anything they did was paid by Kevin. As part of the independence they entered into this marriage by agreement. Lisa during the period she chose to work kept her own money which during the marriage until she finally quit was approximately $225,000. It was gone. She had on her affidavit $20,000. Now she testified he paid all the bills. He did everything from it. Now again the court in valuing this from an evidentiary standpoint it was suggested well this is a new issue. This is evidence. Undisputed evidence. There was no explanation where that $225,000 went. Did anyone ask for an explanation? No your honor. Is that telling? Isn't that part of the arrangement? I'm not going to ask you where you spend your money because you happen to be my spouse and I have a good income so I'm going to pay for everything. And I'm not requiring you to set that money aside. Yes your were any questions asked? What did you do with all that money you earned when you were a teacher? No. Not specifically. No. It was just unaccounted for. Which is a category. It's not just who earned the income. It's whether or not it was preserved by the parties. Every asset that's in question here and has to be divided as marital property came from Kevin. There was no contribution whatsoever from Lisa. Now the significance of that is the court in weighing what appears to be or is claimed to be some horribly disproportionate division of marital property could consider that fact. Could consider the fact that we had a grasshopper and ant situation. This was not a dissipation situation. Although apparently the money disappeared at the same time there's a claim that the marriage was irretrievably broken. It was a situation where it wasn't preserved. Now was that part of their agreement? Yes. Likewise part of their agreement and the payments to this Mrs. O'Connell started I believe in 97 but it was a year after they got married. She worked in his office. Kevin's a sole practitioner. He has no secretary and he had her come in from time to time. Sometimes you just need a body. You need somebody to execute a will. You need somebody to witness a will. You need somebody to maybe just help you out, bounce off an idea, whatever it is. Trial judge again heard the testimony with regard to this. And he made a factual determination that based on credibility. And another thing that Mr. Martinkus asked he said well gee everything seemed to go against my client. Now an explanation for that certainly if this were a jury trial an explanation for that is that's because the trial judge having heard the testimony reviewed the documents and the exhibits didn't believe her on certain issues. The maintenance point is an example of that. Mr. Martinkus said... Did the court specifically say that he did not believe her on certain issues and so what were those issues? No, he didn't make a specific finding that he believed. Other than he believed in a generic sense she was capable of working. Essentially he rejected the argument that he was incapable. Did he make a specific finding? I don't believe her, no. But implicit in that is he didn't. And if we take a look at judge as fact fighter yes there is medical testimony from a psychologist, but the testimony boiled down to a woman comes in, says she's traumatized by her husband's purported affair and tells me she's too upset to work. That's the testimony. And he said well if that's true she can't work. The court looked at the evidence relative to this and determined that her behavior and the things she was capable of doing were inconsistent with that. She was capable of doing a number of things. She voluntarily undertook to represent her neighborhood association when they were opposing the liquor store that they were trying to put in on I think maybe it was Wabash. I mean she was capable of doing these things. But I think what's telling is the explanation for this, and by the way she didn't work for many years before there was any of these issues whatsoever. I mean the judge knew that she didn't quit because she was upset. She didn't have a mental problem. She didn't seek treatment. She didn't do anything. She didn't even go to this guy until I think a week before she went to a lawyer to begin this divorce procedure. But interestingly enough, despite the testimony of how debilitating it is and all of which, her testimony about how horrible this was, was because of thinking about her ex-husband. The testimony was she managed to having all day, she had no place to be she didn't work, but having that opportunity she chose to go down to the swimming pool and swim next to him on the only time he could swim because he had to go to the pool. Now I think if this were in any other context, if a fact finder was to ask because of an auto accident can this woman not work with the same testimony, I don't think there would be any question a jury would be entitled to reject it as inconsistent with her behavior and what she was able to do. The prescription medicine his notes, not his testimony his notes reflect she asked for it she asked for the soap. That's what's in his notes. So essentially the judge was in a position and he's the fact finder and his determination of fact based on the evidence I believe is entitled to that of any other fact finder. He heard her, he heard Kevin. If he determines that there is no disability, then what he's left with is a woman who is capable, trained and experienced to go back to the job she voluntarily left. The respondent introduced into evidence that they were looking District 186 was looking for teachers with her experience range and gave the salary range. This is a woman who had 20 years in the district. I mean I think the judge was certainly legitimate in assuming if you go down there and apply I think you may get this job but she chose not to do that. Instead, getting back to the assets, she chose to spend during dependency in this case and there wasn't a temporary maintenance order ever in it. She received disposition of marital assets totaling I believe $190,000. Ran up another $30,000 in credit card bills during dependency of this action. Because another issue that the court factually had to address was the cost of their lifestyle. Which getting back to the maintenance issue is I believe the fundamental purpose of the maintenance. It's not a property distribution. I believe that was the whole nature. It's to make sure, if possible that both parties can maintain the same lifestyle. That lifestyle was quantified by Mr. Murray. Not by what she did after the divorce, but by how these parties lived during their marriage. And he determined that their expenses were approximately a little less than $4,800 a month, which included $573 for the mortgage payment, which was satisfied during dependency of this cause, again, by the payments, the monies that came from Kevin's income. And health insurance, which would have been provided had she elected to get a job. So I think again, the facts are certainly clear that the judge, as fact finder, could have determined that with her rental property, with the job she was capable of getting and doing and had done for 20 years, and the investment of the income that she had, that she could more than adequately support the lifestyle she had and she maintained. Now, getting back to some of these other issues, the issue of the residence. Again, the testimony was that from both Kevin's pre-marital income, the proceeds from his house, they elected to move into her house, and a loan he took out and satisfied from his income, again, out of his side, hers being wherever it is. And the other source, because everything that was spent came from that there was $103,000 invested in it, there was also no dispute that 56, the number Mr. Hurst used is $56,000 which was the principle of the mortgage at the time the parties were married. Now, as Mr. Martinkus said, some of these things are just math. One of the math facts is the mortgage was introduced into evidence, the interest rate was introduced into evidence, the payment was introduced into evidence, and it was a 15-year term. So you could calculate as to each payment, but more importantly as to the full satisfaction of the term of the loan, how much principle was paid, $56,000 which obviously enhanced the net value of the property, as well as an additional $32,000 or $33,000 of interest after the marriage. Not to mention the taxes and all of the things that go with the house, insuring the house, all of those things which, again, were contributed by the marital estate. And that's what we're talking about, with the exception of $28,000 which was Kevin's premarital proceeds from his home. What the judge said is this money came from the marital estate and therefore the marital estate needs to be reimbursed. To say there was no evidence is inaccurate. What Roger Hearst did is he looked at the valuation of the property for tax purposes. That was conducted by the county. The parties benefited from that appraisal because that's what their tax base was. And again, the trial judge is put in the position of sorting this out because both parties weren't real helpful on this score. There was no objection. Mr. Hearst went in with his testimony. There was no objection that his valuation was based on the tax appraisal. And likewise, just a report from an appraiser was introduced into evidence. The judge was asked to sort this out with nothing more than that. Two pieces of paper. And to say he erred or his finding was against the manifest weight of the evidence when those were the options he had, pick one, I think is unreasonable. The trial judge did what needed to be done. As to the enhancement of value, I think this court has indicated an opinion that there is some benefit beyond the mere market value of the property as far as improvements. Obviously paying off the mortgage is a dollar for dollar because whatever the value of the property is, it's enhanced by the mortgage value. But as far as the kitchen and remodeling and any of the other benefits, these are things which stay with the house and continue to benefit the party with the house. So as far as the reimbursement, it's not enough to just say, and by the way, there was no evidence of that. Again, the judge was left to his own devices. The judge can only tell the court anything they don't know. A judge can only rule on what he has before him. And if there is no benefit, if nobody gives him any input and says, well, you know, houses have gone up 20% and it would have went up 20%, there was none of that. The only evidence was that from the time they got married, this much money was put in that and it was still substantially less than the market value. Thank you, counsel. Two different cases. Two very different cases. Again, I think what I would like to comment on is Mr. Randall's assertions and assumptions that somehow this judge decided that my client couldn't explain away money she got during the marriage as a basis to disproportionately award her marital property. That's silly. There's not even a faintest suggestion. As a trial lawyer, how would I ever, ever think I've got to explain money that my client received without notice of a claim of dissipation? That's a hard one. I think trial lawyers might as well become plumbers because we would never meet expectations if we had to speculate as to what someone may have thought about what money was used. Well, is it appropriate for a trial court to, without it being raised, but it being in evidence, to think of the grasshopper ant analogy which Mr. Randall used and just think that but for earlier decisions you made you would be more comfortable? I don't think so. Because if that's the case, then why do we even change the law in 76? Because now we're talking about, oh, he's the breadwinner, he puts the property in his name, Mrs. So-and-so, you're just out of luck. Too bad. No, I don't think so because that's what happened in 76. Otherwise, you wouldn't need this concept of dissipation. Dissipation is designed to address that situation. If someone's saying, you know what, we had a crummy marriage and it started to break down and she went to Vegas and she took this money and she put it in her house, absolutely. Put me on notice. Now I can say, hey, Mrs. So-and-so, Lisa, what did you do with this money? Well, I spent this money for my husband on this, we took trips together and so-and-so. I mean, that's part of the problem. I mean, for example, you talk about that issue and whether or not, first of all, there's no agreement here, not to digress, but the other thing here is that implicit that the trial court didn't believe her is hogwash and a red herring. There is nothing to suggest that this court made rulings because of the unreliable testimony presented by my client. The expert did say, I don't know quite how he phrased it, but that the trauma of separation and divorce brings on certain conditions and symptoms and that the passage of time lessens those and that people are able to return to their normal lives. That's why I think a reservation of a review in two years or something, okay, I have no problem with that. But to cut her off automatically when the only medical testimony is that she's having these problems. And he said specifically, don't return to teaching way too stressful. This would be difficult for you. But it wouldn't be unreasonable. I wouldn't be even arguing it if the judge said a reasonable amount of support and said, you know what, there's a lot of uncertainty here. Your doctor said that this stuff might dissipate in a couple years. Come on back in two years, we'll look at it. And if you're doing fine or if you haven't made effort, maybe he'll make a change. But to arbitrarily just cut her off after two years. You know, the other thing too, Judge, is that there are testimonies that these people wrote a check, check, cash, for a 2001 BMW, a 2002 BMW, a 2005 BMW, two Jeep Grand Wagoners, a 2400 motorcycle, a rowing show, a kayak, a boathouse, and two bicycles that cost $3,500 apiece. They had trips. This is not a case where these people lived on poverty. They lived very, very, very nicely. So you do have the standard of living. And the other way of hearing about this is if Selinger means anything, impugn on her $50,000. Assume at some point she can get it. You still have a great discrepancy between someone who makes over $200,000 a year and someone who's not going to make more than $50,000 or so. So how do you fill that gap? That's why I think maintenance under Selinger, at least, would be appropriate. But I think maybe a review. I can't quarrel with that. That's fair. Whether you call it permanent or not, or a review. But to cut her off after two years without the benefit of knowing how she's doing and so forth when you have someone who makes substantial money, I don't think that's right. I really don't. I don't think that's consistent either. There's some other questions here I think that raised on, I hate to say this, but counsel's suggestion that Katherine O'Connor was called in the office to, quote, bounce off an idea. I think the testimony was far different than that. There was a lot more going on there than Mr. McDermott bouncing some ideas off Katherine O'Connor. And again, it's difficult because I don't care if he's having an affair. I truly don't. But how do you take... Is it possible for the court to have concluded that yes, that was some meaningful relationship which may have affected the marriage, but nonetheless there wasn't any evidence of it being sexually intimate, and two, the parties put up with it? Absolutely. But that doesn't change the issue of dissipation. You don't have to dissipate to someone you're having an affair with. I can go dissipate by using funds to further something I like. I can go to the OTB and I can bet thousands of dollars and waste it. It's not related to my paramour. That just happened to be the case. And why it's particularly telling is because of the testimony which I set forth in the brief. Oh, I don't remember. Did he lend you money to buy a house? Geez, I don't remember that one. It's ridiculous. I'm sorry. But if you take that in the context of an affair, the inference a court could draw is that that testimony doesn't hold water. That's the reason I raise this, is to put this in perspective. If you're having an affair, then that testimony is ridiculous because I don't remember, can't explain, don't have an idea, all these checks. Oh, did I write that check? It's unreal. I read the stuff and I was just shocked. There is plenty of testimony. I got the impression that Judge Mitchell decided that, well, I'm not going to try dissipation, not because the evidence didn't support it, but because he decided that dissipation couldn't start until irretrievably broken marriage was done. It was in 2005 when you separated. Holthaus says just the opposite. When does it start? 2001. No sex, no communication, nothing. That's when it started. So those are my thoughts, Judge. I think that if you look at this, this is clearly a case that you look at the mortgage paydown, $56,000 over 13 years. Over. Thank you.